**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

ACHOR FAMILY PHARMACY, LLC; BRINKLEY FAMILY PHARMACY, LLC; BUERKLE DRUG MGMT., LLC; FORREST CITY FAMILY PHARMACY, LLC; GARNER FAMILY PHARMACY, LLC; GETWELL RX, LLC; MCKENNEY FAMILY PHARMACY, LLC; POLK PHARMACY MANAGEMENT, LLC; NASHVILLE FAMILY PHARMACY, LLC; PALESTINE FAMILY PHARMACY, LLC; REDFIELD PHARMACY MGMT., LLC; and WOODLANDS PHARMACY MGMT., LLC;

*Plaintiffs,*

v.

EXPRESS SCRIPTS, INC.,

Serve at:
CT Corporation System, Registered Agent
5661 Telegraph Road, Suite 4B
St. Louis, Missouri 63129

*Defendant.*

Case No. ________________

**JURY TRIAL DEMANDED**

**COMPLAINT**

Date: October 28, 2026

Plaintiffs Achor Family Pharmacy, LLC; Brinkley Family Pharmacy, LLC; Buerkle Drug Mgmt., LLC; Forrest City Family Pharmacy, LLC; Garner Family Pharmacy, LLC; Getwell Rx, LLC; McKenney Family Pharmacy, LLC; Nashville Family Pharmacy, LLC; Palestine Family Pharmacy, LLC; Polk Pharmacy Management, LLC; Redfield Pharmacy Mgmt., LLC; and Woodlands Pharmacy Mgmt., LLC (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against Defendant Express Scripts, Inc. ("Express Scripts"), and in support thereof allege as follows:

## NATURE OF THE ACTION

1. An independent pharmacy pays for its medicine before the patient ever walks through the door. When the patient arrives and the prescription is submitted, it is Express Scripts (a pharmacy benefit manager)—and not the pharmacy—that dictates, in real time, what the pharmacy will be paid. And, once the pharmacist hands the medicine across the counter, the transaction cannot be unwound: the drug cannot be taken back, restocked, or resold. The pharmacy's money moves first; Express Scripts' systems decide, after the fact and unilaterally, what amount, if any, that the pharmacy will recover.

2. Arkansas responded to that imbalance—and in support of pharmacies like Plaintiffs—by drawing a bright line. Under Arkansas law, a pharmacy benefit manager ("PBM") may not reimburse an Arkansas pharmacy less than the pharmacy's cost of acquiring the drug itself—generally measured by the National Average Drug Acquisition Cost ("NADAC"), the federal government's drug-specific, weekly-updated benchmark of what pharmacies actually pay to acquire each medicine. NADAC is a floor beneath the ingredient cost. It is a minimum payment, not a suggestion, and not an after-the-fact appeal target.[1]

---

[1] *See* Ark. Code Ann. § 23-92-506(b)(5)(A) (Supp. 2025).

3. Express Scripts has always had everything it needs to honor that reimbursement floor at the moment it prices each claim: the drug code, quantity, and fill date; the current NADAC files published by the Centers for Medicare & Medicaid Services ("CMS"); and centralized adjudication systems that already apply plan-specific pricing rules, formularies, and edits in real time.

4. Express Scripts' failure to comply with Arkansas law is not a technological challenge; it is a business decision.[2]

5. Express Scripts repeatedly chose to violate Arkansas law. To wit, during the time-period relevant to this action, Express Scripts reimbursed Plaintiffs below the statutory floor not less than tens of thousands of times—across hundreds of drugs, month after month, through Express Scripts' centralized pricing and adjudication systems.

6. Each of those payments was a separate prescription, a separate transfer of the pharmacy's inventory to a patient, and a separate payment below the minimum that Arkansas law commands. Each was a completed violation of Arkansas law at the moment that it occurred.

7. The pharmacies had no practical choice but to absorb those shortfalls. Refusing or reversing a claim means turning away a patient who needs medicine. And the appeal mechanisms that Express Scripts controlled placed the entire burden of enforcement on its victims: the pharmacy had to discover each underpayment, assemble invoices, file and monitor the appeals, and reconcile any eventual corrections—labor that, for small-dollar shortfalls, can exceed the amount withheld.

---

[2] Ctrs. for Medicare & Medicaid Servs., *National Average Drug Acquisition Cost (NADAC) Data*, https://www.medicaid.gov/medicaid/nadac; Ctrs. for Medicare & Medicaid Servs., *Retail Price Survey*, https://www.medicaid.gov/medicaid/prescription-drugs/retail-price-survey (NADAC is a dated, NDC-specific benchmark derived from a nationwide survey of retail-community-pharmacy invoice acquisition costs and updated weekly) (hereinafter "CMS NADAC Materials").

8. Arkansas regulators saw the problem and responded. Beginning in 2021, the Arkansas Insurance Department ("AID") issued a series of bulletins directing PBMs to build NADAC-minimum claim practices, honor invoice-based and bulk appeals from pharmacies, and to stop invoking contract labels or national systems as excuses for below-floor payment.

9. By April 2024, AID was processing roughly 1,000 to 1,500 below-NADAC claims every month and emphasizing that even small shortfalls violate the law. In August 2024, the Arkansas Governor and AID announced one of the most significant pharmaceutical enforcement actions in Arkansas history, seeking per-prescription penalties—including against Express Scripts.[3]

10. When warnings, corrections, and even per-prescription penalties still proved insufficient to change PBM behavior, the Arkansas General Assembly acted. In 2025, it enacted Act 990, which gives pharmacies themselves the enforcement tool that this action invokes: a private right of action for violations of Arkansas's maximum allowable cost and reimbursement laws, with recovery of attorneys' fees and all costs for a prevailing plaintiff, and statutory damages of up to $10,000 for each violation, through the Arkansas Trade Practices Act.[4]

11. This action rests on a simple, claim-level liability theory: every reimbursement that Express Scripts paid below the applicable statutory floor on or after Act 990's effective date is a separate, completed violation of Arkansas law, fixed at the moment of payment. A later adjustment

---

[3] *See* Ark. Ins. Dep't, Bulletin No. 4-2024 (Apr. 2024) (hereinafter "Bulletin 4-2024"); *See* Office of the Governor of Ark., Press Release, *Governor Sanders, Arkansas Insurance Department Enforce Arkansas Law Against PBMs* (Aug. 2024), https://governor.arkansas.gov/news_post/governor-sanders-arkansas-insurance-department-enforce-arkansas-law-against-pbms/ (announcing penalties of $5,000 sought per below-NADAC payment—including nineteen alleged Express Scripts violations from July 2024—in what the State described as the largest pharmaceutical enforcement action in Arkansas history) (hereinafter "Governor's Aug. 2024 Enforcement Release").

[4] *See* 2025 Ark. Acts 990 (S.B. 583) (codified at Ark. Code Ann. § 17-92-507(h) (Supp. 2025)).

may reduce an unpaid compensatory balance; it cannot retroactively make an unlawful payment lawful. Were it otherwise, the statutory floor would become an interest-free option for PBMs to underpay pharmacies until caught—precisely the enforcement gap that Act 990 closed.

12. Plaintiffs are twelve of the many independent Arkansas pharmacies that Express Scripts has underpaid in violation of Arkansas law. They serve communities across the State of Arkansas—including rural communities, where the local independent pharmacy is the principal, and sometimes the only, point of access to prescription medicines and pharmacist care. They bring this action to recover statutory penalties from Express Scripts for what Arkansas law entitles them to and to require that the next Arkansas prescription be paid lawfully by Express Scripts the first time.

13. At bottom, this case asks one question that Express Scripts' own transaction data can answer for every challenged claim: did Express Scripts pay at least the floor that Arkansas law requires? Where it did not, each unlawful payment carries the consequences that Arkansas law mandates. Plaintiffs seek compensatory damages, statutory damages in an amount to be determined at trial, injunctive and declaratory relief, and their attorneys' fees and costs.

## PARTIES

***Plaintiffs***

14. Achor Family Pharmacy, LLC ("Achor Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Maumelle, Arkansas. All the members of Achor Family Pharmacy are citizens of the state of Arkansas.

15. Brinkley Family Pharmacy, LLC ("Brinkley Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Brinkley, Arkansas. All the members of Brinkley Family Pharmacy are citizens of the state of Arkansas.

16. Buerkle Drug Mgmt., LLC ("Buerkle Drug") is a citizen of Arkansas. It operates an independent pharmacy in Stuttgart, Arkansas. All the members of Buerkle Drug are citizens of the state of Arkansas.

17. Forrest City Family Pharmacy, LLC ("Forrest City Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Forrest City, Arkansas. All the members of Forrest City Family Pharmacy are citizens of the state of Arkansas.

18. Garner Family Pharmacy, LLC ("Garner Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Jonesboro, Arkansas. All the members of Garner Family Pharmacy are citizens of the state of Arkansas.

19. Getwell Rx, LLC ("Getwell Rx") is a citizen of Arkansas. It operates an independent pharmacy in Cabot, Arkansas. All the members of Getwell Rx are citizens of the state of Arkansas.

20. McKenney Family Pharmacy, LLC ("McKenney Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Piggott, Arkansas. All the members of McKenney Family Pharmacy are citizens of the state of Arkansas.

21. Nashville Family Pharmacy, LLC ("Nashville Family Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Nashville, Arkansas. All the members of Nashville Family Pharmacy are citizens of the state of Arkansas.

22. Palestine Family Pharmacy, LLC ("Palestine Family Pharmacy") is a citizen of Arkansas. It operated an independent pharmacy in Palestine, Arkansas. All the members of Palestine Family Pharmacy are citizens of the state of Arkansas.

23. Polk Pharmacy Management, LLC, d/b/a Middleton Pharmacy ("Middleton Pharmacy"), is a citizen of Arkansas. It operates an independent pharmacy in Clarendon, Arkansas. All the members of Middleton Pharmacy are citizens of the state of Arkansas.

24. Redfield Pharmacy Mgmt., LLC ("Redfield Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in Redfield, Arkansas. All the members of Redfield Pharmacy are citizens of the state of Arkansas.

25. Woodlands Pharmacy Mgmt., LLC ("Woodlands Pharmacy") is a citizen of Arkansas. It operates an independent pharmacy in White Hall, Arkansas. All the members of Woodlands Pharmacy are citizens of the state of Arkansas.

26. No member of any Plaintiff, at any level of ownership, is a citizen of Delaware or Missouri.

***Defendant***

27. Express Scripts is a Delaware corporation with its principal place of business at One Express Way, HQ2E04, St. Louis, Missouri 63121. It is a citizen of Delaware and Missouri.

28. Express Scripts is one of the three dominant PBMs in the United States. In 2023, Express Scripts administered approximately 23% of all prescriptions in the United States.[5] As a PBM, Express Scripts serves as an intermediary between prescription-drug plans and pharmacies and reimburses pharmacies for covered prescriptions, less applicable patient cost sharing.[6]

[5] *See* Complaint ¶¶ 3, 18–19, *In re Caremark Rx, LLC*, Docket No. 9437 (F.T.C. Nov. 26, 2024) (identifying Caremark, ESI, and Optum as the three dominant PBMs and stating that ESI administered approximately 23% of U.S. prescriptions in 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/612314.2024.11.26_part_3_administrative_complaint_-_revised_public_redacted_version.pdf.

[6] *See Rutledge v. Pharmaceutical Care Management Ass'n*, 592 U.S. 80, 83–84 (2020) (explaining that PBMs serve as intermediaries between prescription-drug plans and pharmacies and reimburse pharmacies after prescriptions are filled).

29. Express Scripts is an Arkansas-licensed PBM authorized to provide pharmacy benefit manager services in Arkansas and is therefore obligated to follow Arkansas law in doing so.

30. Express Scripts' registered agent for service of process is CT Corporation System, 5661 Telegraph Road, Suite 4B, St. Louis, Missouri 63129.

## **<u>JURISDICTION AND VENUE</u>**

31. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are completely diverse and the amount in controversy as to each Plaintiff exceeds $75,000, exclusive of interest and costs. Each Plaintiff is a limited liability company whose members, at every level of ownership, are citizens of Arkansas. Defendant Express Scripts, Inc. is incorporated in Delaware and maintains its principal place of business in St. Louis County, Missouri, and is therefore a citizen of Delaware and Missouri under 28 U.S.C. § 1332(c)(1). Each Plaintiff seeks compensatory damages and statutory damages of up to $10,000 for each of hundreds or thousands of separately alleged violations, placing more than $75,000 in controversy for each Plaintiff independently. This Court has personal jurisdiction over Express Scripts because its principal place of business is located within this District. Venue is proper under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Express Scripts, the sole Defendant, resides in this District for venue purposes.

## **<u>PRE-SUIT NOTICE AND PREVIOUS STATE COURT ACTION</u>**

32. On June 23, 2026, Plaintiffs, while reserving all rights, notified Express Scripts of the claims asserted here in writing and offered to meet in good faith to attempt to resolve them, consistent with the dispute-resolution provisions of Express Scripts' Network Provider Manual

(the "Manual"), which Express Scripts designates as confidential and which is, therefore, not attached to this public filing.

33. Express Scripts did not respond to Plaintiffs' notice or their offer to meet. Plaintiffs have satisfied, exhausted, or are excused from any applicable contractual pre-suit procedure.

34. On September 15, 2026, Plaintiffs filed their lawsuit against Express Scripts in the Circuit Court of St. Louis County, Missouri, *Achor Pharmacy v. Express Scripts, Inc.*, No. 26-SL-CC06268, for below-NADAC violations under Ark. Code Ann. § 17-92-507(h). On October 27, 2026, after negotiations with Defendant's attorneys, Plaintiffs filed a Notice of Dismissal Without Prejudice, pursuant to Rule 67.02(a) of the Missouri Rules of Civil Procedure, in 26-SL-CC06268, but as represented to Defendant's counsel, Plaintiffs reserved all rights and made no stipulations or admissions as to Defendant's attorneys' arguments.

## FACTUAL ALLEGATIONS

### *A. The Prescription Transaction Places the Pharmacy at Express Scripts' Mercy*

35. A pharmacy generally purchases and pays for a drug before dispensing it, bearing the inventory, storage, expiration, security, and operating costs of keeping medicine available. Its cash moves first, exposing each claim to the risk that reimbursement will be less than the amount already spent. Prescription drugs are not ordinary retail goods: once dispensed, they cannot be returned to inventory, resold, or repossessed, and the clinical encounter cannot be unwound.[7]

---

[7] *See* Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (Interim Staff Report, July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf (hereinafter "FTC First Interim Report"); *see also* Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (Second Interim Staff Report, Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf (hereinafter "FTC Second Interim Report").

36. When a covered patient presents a prescription, the pharmacy transmits the patient, plan, pharmacy, prescription, national drug code ("NDC"), quantity, days' supply, and requested payment data. Express Scripts' system responds in real time: it accepts or rejects the claim, determines patient responsibility, applies the selected pricing method, and creates a receivable that Express Scripts may later alter through fees, reversals, recoupments, or adjustments.[8]

37. The pharmacy cannot negotiate that claim-level response. Reversing or refusing the claim may send a patient away without medicine, force a transfer, delay therapy, or end a longstanding patient relationship. For many prescriptions, that is not a realistic option.




***Figure 1.*** *The claim-level transaction: the pharmacy's money moves first, and Express Scripts' systems set the price (illustrative).*

38. Express Scripts possesses everything necessary to comply with Arkansas law before returning the claim response: the NDC, quantity, fill date, plan, pharmacy, ingredient reimbursement, fee components, and the current CMS NADAC files. Express Scripts' systems

[8] *See* Evernorth Health Servs., *Express Scripts Pharmacy Benefit Services*, https://www.evernorth.com/our-solutions/express-scripts-pbm (hereinafter "Evernorth Corporate Materials"); T. Joseph Mattingly II, David A. Hyman & Ge Bai, *Pharmacy Benefit Managers: History, Business Practices, Economics, and Policy*, 4 JAMA Health Forum e233804 (2023).

already apply plan-specific formularies, network rates, cost sharing, and prior-authorization edits in real time, and they are equally capable of applying an Arkansas-specific reimbursement floor.[9]

39. Express Scripts' claims, pricing, remittance, reversal, adjustment, and appeal data can identify each transaction, the benchmark in effect, the shortfall, the responsible pricing rule, and whether or when a claim was later corrected. The proof is electronic and transaction-specific.

### *B. Arkansas Established a Reimbursement Floor That Express Scripts Was Required to Honor*

40. Arkansas has adopted complementary protections governing pharmacy reimbursement. Section 17-92-507 of the Arkansas Code regulates Maximum Allowable Cost ("MAC") lists, defined functionally to include any list or methodology used, directly or indirectly, to set the maximum allowable cost on which reimbursement is based. The law follows the payment mechanism—including layered formulas, price files, lesser-of rules, and network rates—rather than the label that a PBM selects.

41. Whatever "contract labels" Express Scripts uses in its contracts to describe a reimbursement methodology—"contracted rate," "network rate," or some "lesser-of" formula, the PBM cannot justify paying below Arkansas's statutory floor by merely saying that the payment resulted from a contractually defined pricing formula. Whatever the contract calls the rate, the actual reimbursement must comply with the NADAC minimum.

42. Separately, Ark. Code Ann. § 23-92-506(b)(5)(A) sets a minimum reimbursement rate for the drug itself: a PBM may not reimburse a pharmacy less than NADAC—CMS's weekly, drug-specific benchmark of pharmacy acquisition cost. Because CMS publishes NADAC by drug

[9] *See* CMS NADAC Materials.

and effective date, every prescription claim can be tested against the NADAC rate in effect when the prescription was filled.[10]

43. The floor cannot be evaded by relabeling or offsetting. A PBM may not reduce a dispensing fee or other compensation to claw back what the floor requires: the dispensing fee pays for professional and operational services, and the statutory floor does not permit a PBM to replace a higher contractual rate with the minimum. AID has warned that reimbursement even at the strict minimum may be inadequate to sustain an adequate pharmacy network.[11]




***Figure 2.*** *How Arkansas's reimbursement floor works: NADAC is a floor under the ingredient cost—not total compensation, and not a ceiling (illustrative).*

---

[10] *See* Ark. Code Ann. § 23-92-506(b)(5)(A) (Supp. 2025).

[11] *See* Ark. Ins. Dep't, Bulletin No. 8-2024, *PBM Reimbursement(s) at NADAC Minimum Levels* (June 28, 2024), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_8-2024.pdf (hereinafter "Bulletin 8-2024"); *see also, Cent. States, Se. & Sw. Areas Health & Welfare Fund v. McClain*, No. 25-2727, 2026 WL 2510865, at *3 (7th Cir. Aug. 26, 2026) (Provision of rule issued by AID, which requires health benefit plans to pay additional dispensing fees to pharmacies, was a permissible cost regulation that did not bear impermissible connection to ERISA plans; rule was not preempted by ERISA**).**

### *C. Express Scripts Had Years of Regulatory Notice and Every Ability to Comply*

44. AID's repeated public bulletins gave licensed PBMs like Express Scripts clear and escalating notice of these rules. Bulletin 13-2021 directed PBMs to establish NADAC minimum-claim practices. Bulletin 11-2021 rejected generic-effective-rate ("GER") or labeled contracted rates as a basis to deny a proper appeal and cautioned against demanding support beyond the pharmacy invoice.[12]

45. Bulletin 5-2022 required PBMs to accept bulk or batched appeals and invoice transmission, because claim-by-claim procedures burden pharmacies and the regulator alike. Bulletin 11-2022 warned PBMs against originating contracts whose formulas projected reimbursement below NADAC.[13]

46. Bulletin 4-2024 documented recurring prescription-level underpayments, directed system improvement, and announced per-prescription penalties. Bulletin 8-2024 confirmed that a PBM may not treat NADAC as total compensation or strip a dispensing fee to drive payment down to the floor.[14]

---

[12] *See* Ark. Ins. Dep't, Bulletin No. 13-2021, *"NADAC" Pricing Minimums* (Aug. 27, 2021), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_13-2021.pdf (hereinafter "Bulletin 13-2021"); *see also* Ark. Ins. Dep't, Bulletin No. 11-2021, *Maximum Allowable Cost Appeals to the Arkansas Insurance Department* (July 8, 2021), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_11-2021.pdf (hereinafter "Bulletin 11-2021").

[13] *See* Ark. Ins. Dep't, Bulletin No. 5-2022, *Bulk Appeals and Invoice Costs in MAC Appeals* (Mar. 9, 2022), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_5-2022.pdf (hereinafter "Bulletin 5-2022"); *see also* Ark. Ins. Dep't, Bulletin No. 11-2022, *NADAC Reimbursement Violations in Originating PBM Reimbursement Contracts* (Sept. 20, 2022), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/bulletin_11-2022.pdf (hereinafter "Bulletin 11-2022").

[14] *See* Bulletin 4-2024.

47. AID has also recognized that NADAC changes dynamically and that national PBMs may need state-specific systems—and it has made equally clear that implementation difficulty does not excuse noncompliance.

48. What PBMs must do is straightforward: program lawful payment at the point of sale and preserve the compensation owed at or above the floor. Express Scripts needed to do that in Arkansas, but did not.

49. Compliance is indisputably feasible. In February 2026, Express Scripts agreed, in a settlement with the Federal Trade Commission, to transition its standard retail community pharmacy offering to an acquisition-cost-plus-dispensing-fee model—confirming that Express Scripts can pay pharmacies lawfully, by reference to acquisition cost, at the point of sale.[15]

***D. Post-Payment Correction Alone Could Not Stop the Underpayments***

50. AID initially responded to below-NADAC complaints by requiring an upward adjustment, often without an additional fine. That could restore part of the principal—but only after the pharmacy found the violation, financed the shortfall in the interim, and diverted staff to obtain the correction.

51. That approach, however, did not stop the misconduct. By April 2024, AID was processing approximately 1,000 to 1,500 below-NADAC claims per month across multiple PBMs, including Express Scripts;[16] pharmacies filed roughly 3,000 such complaints in 2024;[17] and AID's

[15] *See* Fed. Trade Comm'n, Press Release, *FTC Secures Landmark Settlement with Express Scripts to Lower Drug Costs for American Patients* (Feb. 4, 2026), https://www.ftc.gov/news-events/news/press-releases/2026/02/ftc-secures-landmark-settlement-express-scripts-lower-drug-costs-american-patients; *In re Caremark Rx, LLC*, FTC Docket No. 9437, Agreement Containing Consent Order and Proposed Decision and Order as to the ESI Respondents (Feb. 4, 2026) (hereinafter "FTC–ESI Settlement Materials").

[16] AID Bulletin 4-2024.

[17] AID Rule 128 Report.

subsequent analysis found that 654 plan data reports—covering approximately 340,000 Arkansas lives—consistently reimbursed pharmacies below NADAC.[18]

52. Each complaint required the pharmacy to identify the claim, assemble invoices, submit and monitor an appeal, and reconcile the result. For small-dollar shortfalls, that labor can exceed the amount withheld, making a nominal appeal practically useless. The PBM, by contrast, controlled the system and possessed complete adjudication data. A correction-only regime therefore placed the cost of policing the PBM on pharmacies and the State, while the PBM retained the full benefit of every underpayment that went undetected and unchallenged.[19]

### *E. Further Arkansas Action: Per-Prescription Penalties and Direct Enforcement*

53. Because correction alone had failed, AID moved enforcement to per-prescription penalties and system correction—reflecting that each prescription is a separate act of payment and a separate obligation to comply with the reimbursement floor.[20]

54. In August 2024, Arkansas Governor, Sarah Huckabee Sanders, and AID announced what they described as the largest pharmaceutical enforcement action in Arkansas history, seeking $5,000 for each payment below NADAC—including nineteen alleged Express Scripts violations from July 2024 alone.[21]

---

[18] *See* Ark. Ins. Dep't, *Rule 128 Report to the Joint Budget Committee* (May 16, 2025), https://www.arkleg.state.ar.us/Home/FTPDocument?path=/Assembly/Meeting+Attachments/000/27500/Exhibit+H.10.a+-+JBC+2025.05.16+Rule+128+Report.pdf (reporting that 654 of 3,347 analyzed plan data reports — approximately 19%, covering roughly 340,000 Arkansas lives — consistently reimburse pharmacies below NADAC) (hereinafter "AID Rule 128 Report").

[19] *See* Bulletin 5-2022; *see also* Bulletin 11-2022.

[20] *See* Bulletin 4-2024.

[21] *See* Governor's Aug. 2024 Enforcement Release.

55. AID commenced an enforcement proceeding against Express Scripts Administrators, L.L.C. concerning those nineteen below-NADAC reimbursements (AID Tracking No. 161884), and the Department's public docket reflects an order entered September 2, 2025.[22]




***Figure 3.*** *From warnings to a private right of action: the enforcement record (illustrative).*

### *F. The General Assembly Responds: Act 990 Gives Pharmacies a Powerful Enforcement Tool*

56. Even direct regulatory enforcement, however, left the underlying economics intact: A regulator processing individual complaints against one PBM at a time cannot police hundreds of thousands of claim-level payment decisions, and the pharmacies still bore the cost of uncovering violations.

57. The General Assembly, therefore, closed the enforcement gap in 2025 when it enacted Act 990, which authorizes pharmacies, pharmacists, and businesses providing pharmacy services to bring private actions for violations of § 17-92-507 and to pursue the remedies available under the Deceptive Trade Practices Act, the Arkansas Pharmacy Benefits Manager Licensure Act, and the Arkansas Trade Practices Act. A prevailing plaintiff may recover its attorneys' fees and

[22] *See* AID Tracking No. 161884 (order entered Sept. 2, 2025); *see also* Governor's Aug. 2024 Enforcement Release.

all costs, and a violation pursued through the Trade Practices Act pathway may support statutory damages of up to $10,000 for each violation, in addition to other available relief.[23]

58. Act 990 realigns the incentives that the prior, correction-only, enforcement had inverted: Act 990 places the consequence of each unlawful payment on the party that controlled the payment (the PBMs, like Express Scripts), rather than leaving pharmacies and the State to bear the cost of detecting and undoing PBM misconduct one claim at a time.

### *G. The Actionable Period and the Claim-Level Nature of Each Violation*

59. Act 990 took effect on August 5, 2025.[24]

60. Plaintiffs seek statutory damages and other Act 990 remedies only for conduct within the Act's lawful temporal and substantive scope—that is, only for reimbursements Express Scripts made on or after the Act's effective date. Plaintiffs allege Express Scripts' earlier conduct, and the regulatory history described above, solely to establish Express Scripts' notice, knowledge, pattern, and system design, and the inadequacy of correction-only enforcement—not as a basis for statutory damages.[25]

61. Each separately adjudicated prescription claim that Express Scripts paid below the required reimbursement floor during the actionable period is a separate, completed violation of Arkansas law. That transaction-level treatment follows from the statutory command, from AID's own prescription-level enforcement, and from Act 990's per-violation remedial structure.

---

[23] *See* 2025 Ark. Acts 990 (S.B. 583) (codified at Ark. Code Ann. § 17-92-507(h) (Supp. 2025)).

[24] *See* Ark. Ins. Dep't, Bulletin No. 9-2025 (June 12, 2025) (summarizing insurance-related legislation enacted during the 2025 Arkansas legislative session, including Act 990, effective August 5, 2025).

[25] Ark. Code Ann. § 17-92-507(h) (Supp. 2025).

62. Each such claim likewise worked a distinct withdrawal of the pharmacy's working capital and a distinct patient-access risk.[26]

63. The violation is complete when the PBM underpayment occurs. The statute regulates the act of paying or reimbursing, so lawfulness is measured at the moment of payment—not after the pharmacy detects, documents, and challenges the shortfall. A later payment may reduce the remaining compensatory balance, but it does not erase a completed violation, nor does it compensate for the lost use of funds, the appeal labor, the impaired cash flow, or the operational decisions the pharmacy made while its money was missing.

64. Express Scripts' conduct is ongoing. Express Scripts continues to reimburse Plaintiffs below the statutory floor through the filing of this Complaint, and each new below-floor payment is a new and separate violation.

### *H. Express Scripts' Centralized Systems Repeatedly Paid Plaintiffs Below the Floor*

65. Express Scripts established, maintained, or controlled the pricing logic, MAC lists, source files, network rates, state edits, NADAC updates, fee treatment, reversal procedures, and appeal workflows used to adjudicate Plaintiffs' pharmacy claims. The challenged underpayments came from those centralized systems—not from isolated, claim-level mistakes—and they recurred across pharmacies, drugs, plans, and dates, with recurring patterns involving the same drugs, NDCs, plan groups, and pricing logic.

66. Express Scripts knew or should have known of Arkansas's reimbursement requirements through its licensure, AID's bulletins, its participation in AID regulatory and enforcement proceedings, and the claim data available to it to measure its own compliance. It

---

[26] *Id.*

nonetheless paid Plaintiffs below the reimbursement floor tens of thousands of times during the actionable period, in an amount to be determined at trial.

67. Plaintiffs' experience is illustrative, not exhaustive: Express Scripts' below-floor reimbursement practices have injured many independent Arkansas pharmacies beyond the twelve Plaintiffs named here.

68. Whether a given shortfall is a few cents or many dollars, the statutory command is the same. And, repeated thousands of times, the shortfalls become a recurring withdrawal from the pharmacy's operating account: the cash needed to buy insulin, antibiotics, anticoagulants, seizure medications, cancer drugs, and the next patient's prescription. On the challenged claims, Plaintiffs lost money on the drug itself before paying a dollar toward the people and infrastructure needed to serve the patient.

### *I. Background: Why Below-Floor Reimbursement Matters to Arkansas Communities*

69. The allegations in this Section I provide context for the statutory violations alleged above; Plaintiffs' claims do not depend on proof of Express Scripts' motive or of any competitive strategy.

70. Independent community pharmacies are healthcare infrastructure. They provide services difficult to replace through distant mail order—same-day and emergency fills, medication synchronization, adherence packaging, delivery, counseling, vaccinations, interaction checks, and help resolving coverage problems—and their immediate access proved central to the national vaccination response. Arkansas has lost more than sixty local drug stores since 2016.[27]

---

[27] *See* Ark. Senate, *Legislature Prohibits Pharmacy Benefit Managers from Operating Retail Drug Stores* (Apr. 2025), https://senate.arkansas.gov/senate-news/posts/2025/april/pharmacy-benefit-managers/ (reporting that more than sixty local drug stores have gone out of business since 2016); *see also* Randall C. Burson et al., *Community Pharmacies as Sites of Adult Vaccination: A Systematic Review*, 12 Human

71. In rural and underserved communities, weakening or losing a pharmacy can mean substantially longer travel, dependence on delivery schedules, or delayed treatment. National studies show that rural areas disproportionately depend on independent pharmacies, that pharmacy deserts concentrate in communities already facing transportation, disability, insurance, and socioeconomic barriers, and that thousands of "keystone pharmacies" stand between an entire community and a pharmacy desert.[28] Peer-reviewed research documents persistent declines in medication adherence after pharmacy closures—including a 15.6% decline in anticonvulsant fills that mail order did not materially replace.[29] Arkansas accordingly treats pharmacy-network adequacy as a system-level obligation.[30]

72. Independent pharmacies operate on working capital: they must continuously buy inventory before reimbursement arrives. Repeated shortfalls therefore reduce both current margin and the capacity to purchase the next patient's medicine. Below-cost payment leads a pharmacy to

---

Vaccines & Immunotherapeutics 3146 (2016); Roua El Kalach et al., *Federal Retail Pharmacy Program Contributions to Bivalent mRNA COVID-19 Vaccinations*, 73 MMWR 286 (2024).

[28] *See* Inmaculada Hernandez et al., *Role of Independent Versus Chain Pharmacies in Providing Pharmacy Access: A Nationwide, Individual-Level Geographic Information Systems Analysis*, 1 Health Affairs Scholar (2023); Lucas A. Berenbrok et al., *Access to Community Pharmacies: A Nationwide Geographic Information Systems Cross-Sectional Analysis*, 62 J. Am. Pharmacists Ass'n 1816 (2022); Rachel Wittenauer et al., *Locations and Characteristics of Pharmacy Deserts in the United States: A Geospatial Study*, 2 Health Affairs Scholar (2024); Jenny S. Guadamuz et al., *More U.S. Pharmacies Closed Than Opened in 2018–21; Independent Pharmacies, Those in Black, Latinx Communities Most at Risk*, 43 Health Affairs 1703 (2024); Walter S. Mathis et al., *Vulnerability Index Approach to Identify Pharmacy Deserts and Keystone Pharmacies*, 8 JAMA Network Open e250715 (2025).

[29] *See* Dima M. Qato et al., *Association Between Pharmacy Closures and Adherence to Cardiovascular Medications Among Older U.S. Adults*, 2 JAMA Network Open e192606 (2019); Kelly E. Anderson et al., *Pharmacy Closures and Anticonvulsant Medication Prescription Fills*, 332 JAMA 1847 (2024) (finding a 15.6% decline in fills and a 14.4% decline in days supplied after closure, persisting up to six months, and that mail order did not materially replace lost access).

[30] *See* Ark. Ins. Dep't Rule 106 (Network Adequacy); 23 C.A.R. pt. 137; Ark. Ins. Dep't, Bulletin No. 2-2026, *Pharmacy Network Adequacy Reporting* (Feb. 3, 2026), https://portal.insurance.arkansas.gov/LegalPubsPublic/Documents/Bulletins/Bulletin_2-2026.pdf.

cut inventory, hours, delivery, staffing, or patient capacity—degradation that occurs gradually, before it ever appears in closure data—or ultimately to sell or close altogether.[31]

73. Express Scripts, moreover, is not a neutral processor. It sits within the same corporate enterprise — Evernorth Health Services, a subsidiary of The Cigna Group—as Express Scripts Pharmacy and Accredo Specialty Pharmacy, which dispense prescriptions and compete with independent pharmacies for the same patients and revenue.[32]

74. The FTC has found that vertically-integrated PBMs like Express Scripts can, and do, prefer their affiliated pharmacies, and Arkansas law separately prohibits a PBM from reimbursing an Arkansas pharmacy less than it reimburses its own affiliate for the same pharmacist services.[33] The market is especially concentrated in Arkansas, where the three largest PBMs processed 69.7% of commercial, 92.9% of Medicaid managed-care, and 78.0% of Medicare Part D retail fills in 2023.[34]

### *J. Plaintiff-Specific Allegations*

75. The paragraphs below summarize, for each Plaintiff, the below-floor reimbursements identified to date from the claims data available to Plaintiffs. Because Express Scripts' conduct is continuing and because Express Scripts possesses the complete adjudication

[31] *See* Guadamuz et al., *More U.S. Pharmacies Closed Than Opened*; *see also* Hernandez et al., *Independent Versus Chain Pharmacies*.

[32] *See* Evernorth Corporate Materials; *see also* Mattingly, Hyman & Bai, *Pharmacy Benefit Managers*.

[33] *See* FTC First Interim Report; *see also* FTC Second Interim Report; *See* Ark. Code Ann. § 17-92-507(d)(1)–(2) (Supp. 2025); *see also* Ark. Code Ann. § 23-92-506(b)(4)(A)–(B) (Supp. 2025).

[34] *See* Dima M. Qato, Yugen Chen & Karen Van Nuys, *Pharmacy Benefit Manager Market Concentration for Prescriptions Filled at Retail Pharmacies by State and Payer Type*, 7 JAMA Health Forum e256546 (2026) (Arkansas-specific shares: 69.7% commercial; 92.9% Medicaid managed care; 78.0% Part D (2023)); *see also* FTC First Interim Report; FTC Second Interim Report.

data, the figures below are conservative minimums, and each Plaintiff's entitlement will be established in an amount to be determined at trial.

***Achor Family Pharmacy***

76. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Achor Family Pharmacy below the applicable statutory floor on no fewer than 7,472 separately adjudicated prescription claims.

77. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Achor Family Pharmacy are continuing. For each violation, Achor Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Brinkley Family Pharmacy***

78. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Brinkley Family Pharmacy below the applicable statutory floor on no fewer than 1,494 separately adjudicated prescription claims.

79. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Brinkley Family Pharmacy are continuing. For each violation, Brinkley Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual

financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Buerkle Drug***

80. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Buerkle Drug below the applicable statutory floor on no fewer than 662 separately adjudicated prescription claims.

81. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Buerkle Drug are continuing. For each violation, Buerkle Drug is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Forrest City Family Pharmacy***

82. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Forrest City Family Pharmacy below the applicable statutory floor on no fewer than 7,024 separately adjudicated prescription claims.

83. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Forrest City Family Pharmacy are continuing. For each violation, Forrest City Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages,

actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Garner Family Pharmacy***

84. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Garner Family Pharmacy below the applicable statutory floor on no fewer than 6,491 separately adjudicated prescription claims.

85. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Garner Family Pharmacy are continuing. For each violation, Garner Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Getwell Rx***

86. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Getwell Rx below the applicable statutory floor on no fewer than 6,526 separately adjudicated prescription claims.

87. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Getwell Rx are continuing. For each violation, Getwell Rx is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***McKenney Family Pharmacy***

88. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data — and continuing thereafter, Express Scripts reimbursed McKenney Family Pharmacy below the applicable statutory floor on no fewer than 4,173 separately adjudicated prescription claims.

89. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to McKenney Family Pharmacy are continuing. For each violation, McKenney Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Nashville Family Pharmacy***

90. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Nashville Family Pharmacy below the applicable statutory floor on no fewer than 3,081 separately adjudicated prescription claims.

91. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Nashville Family Pharmacy are continuing. For each violation, Nashville Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Palestine Family Pharmacy***

92. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Palestine Family Pharmacy below the applicable statutory floor on no fewer than 837 separately adjudicated prescription claims.

93. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Palestine Family Pharmacy are continuing. For each violation, Palestine Family Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Middleton Pharmacy (Polk Pharmacy Management, LLC)***

94. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Middleton Pharmacy below the applicable statutory floor on no fewer than 1,458 separately adjudicated prescription claims.

95. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Middleton Pharmacy are continuing. For each violation, Middleton Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Redfield Pharmacy***

96. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Redfield Pharmacy below the applicable statutory floor on no fewer than 4,422 separately adjudicated prescription claims.

97. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Redfield Pharmacy are continuing. For each violation, Redfield Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

***Woodlands Pharmacy***

98. From on or about August 5, 2025 through at least March 31, 2026—the most recent date through which Plaintiffs have analyzed available claims data—and continuing thereafter, Express Scripts reimbursed Woodlands Pharmacy below the applicable statutory floor on no fewer than 4,666 separately adjudicated prescription claims.

99. Each of those reimbursements is a separate, completed violation of Ark. Code Ann. § 17-92-507, and Express Scripts' violations as to Woodlands Pharmacy are continuing. For each violation, Woodlands Pharmacy is entitled to the remedies described in the Counts below, including statutory damages of up to $10,000 per violation, compensatory damages, actual financial losses, and its attorneys' fees and all costs, in amounts to be determined at trial. Ark. Code Ann. § 17-92-507(h)(1)–(3).

### *K. Transaction-Level Pleading and a Conservative, Auditable Methodology*

100. Ingredient reimbursement is tested against the ingredient-cost floor, while dispensing fees, other compensation, and patient cost sharing are stated separately to prevent either undercounting or double counting. Reversals and later adjustments are recorded as separate events rather than backdated. The direct shortfall equals the lawful minimum, minus Express Scripts' ingredient reimbursement, with credit only for a valid reversal or a payment actually made and received; valid later payments reduce compensatory principal without erasing completed statutory violations.[35]

### *L. Express Scripts' Violations Were Knowing, Repeated, and in Conscious Disregard of Arkansas Law*

101. Express Scripts' below-floor reimbursements were not inadvertent. Express Scripts had actual knowledge of the reimbursement floor through its Arkansas license, through AID's repeated public bulletins beginning in 2021, through AID's direct enforcement against Express Scripts entities—including the per-prescription penalties announced in August 2024 and the proceeding culminating in the September 2, 2025 Order—and through Act 990 itself.[36]

102. Express Scripts, at all times, possessed the data and systems necessary to comply at the point of sale, and it demonstrated that ability whenever it corrected an individual claim after complaint: the capacity to fix a claim after the fact proves the feasibility of paying it lawfully in the first instance.

103. Express Scripts, nonetheless, still continues to reimburse Plaintiffs below the floor—after regulatory warnings, after penalties, after Act 990's effective date, and after its own

---

[35] *See* Ark. Code Ann. § 23-92-506(b)(5)(A) (Supp. 2025).

[36] *See* Bulletin 13-2021; *see also* Bulletin 11-2021; *See* Governor's Aug. 2024 Enforcement Release.

February 2026 commitment to the FTC to move to acquisition-cost-based pharmacy payment.[37]

104. Express Scripts' conduct therefore reflects a knowing, willful, and conscious disregard of Plaintiffs' statutory rights and of the consequences to the pharmacies and patients who depend on lawful reimbursement.

## CLAIMS ALLEGED

### COUNT I
### Violation of Ark. Code Ann. § 17-92-507
### (Private Right of Action Under Act 990, Ark. Code Ann. § 17-92-507(h))

105. Plaintiffs incorporate the foregoing allegations in Paragraphs 1-104 of this Complaint as though fully set forth herein.

106. Each Plaintiff is a pharmacy, pharmacist, or business providing pharmacy services authorized to bring a private action under Ark. Code Ann. § 17-92-507(h)(1). Express Scripts is a PBM that established, administered, applied, enforced, or knowingly benefited from the MAC lists and other reimbursement methodologies and appeal practices governed by § 17-92-507.[38]

107. The challenged transactions were reimbursed using a MAC list or another methodology used, directly or indirectly, to set the maximum allowable cost on which reimbursement for prescription drugs was based.[39]

108. Express Scripts violated § 17-92-507 by, among other things: paying Plaintiffs below the lawful reimbursement amount, including below the NADAC floor incorporated through Ark. Code Ann. § 23-92-506(b)(5)(A); maintaining MAC values and methodologies inconsistent with statutory requirements; failing to update or apply lawful reimbursement; and failing to make

---

[37] *See* FTC–ESI Settlement Materials.

[38] *See* 2025 Ark. Acts 990 (S.B. 583) (codified at Ark. Code Ann. § 17-92-507(h) (Supp. 2025)).

[39] *See* Ark. Code Ann. § 17-92-507 (Supp. 2025).

timely and complete corrections. Each below-floor reimbursement during the actionable period constitutes a separate violation to the extent provided by the statute.[40]

109. For these violations, Act 990 entitles Plaintiffs to pursue, cumulatively, the remedies made available through each of § 17-92-507(h)(1)'s three pathways: (a) under § 17-92-507(h)(1)(A), the remedies available under the Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq*.; (b) under § 17-92-507(h)(1)(B), the remedies available under the Arkansas Pharmacy Benefits Manager Licensure Act, Ark. Code Ann. § 23-92-501, *et seq*., including for reimbursement of the ingredient drug product component below NADAC in violation of § 23-92-506(b)(5)(A); and (c) under § 17-92-507(h)(1)(C), the remedies available under the Trade Practices Act, Ark. Code Ann. § 23-66-201, *et seq*., including statutory damages of up to $10,000 for each violation pursuant to § 17-92-507(h)(3).[41]

110. As a direct and proximate result of Express Scripts' violations, Plaintiffs suffered compensatory damages and actual financial losses. Plaintiffs are entitled to compensatory damages, actual financial losses, statutory damages of up to $10,000 for each violation, prejudgment and post-judgment interest, and their attorneys' fees and all costs under § 17-92-507(h)(1)–(3), in amounts to be determined at trial.

## COUNT II
## Declaratory and Injunctive Relief
## (Ark. Code Ann. § 17-92-507(h))

111. Plaintiffs incorporate the foregoing allegations in Paragraphs 1-104 of this Complaint as though fully set forth herein.

---

[40] *See* Bulletin 13-2021; *see also* Bulletin 11-2021; *See* Bulletin 5-2022; *see also* Bulletin 11-2022.

[41] *See* Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*; Arkansas Pharmacy Benefits Manager Licensure Act, Ark. Code Ann. §§ 23-92-501 to -510 (Supp. 2025); Trade Practices Act, Ark. Code Ann. § 23-66-201 *et seq.*

112. An actual and continuing controversy exists concerning Express Scripts' obligation to reimburse Arkansas pharmacy claims lawfully, to preserve compensation above the statutory floor, and to provide a reasonable appeal process. Plaintiffs continue to participate in Express Scripts-administered networks and to submit claims through the same reimbursement systems; Express Scripts' below-floor reimbursements are ongoing; and, without prospective relief, Plaintiffs face a substantial risk of continued underpayment and burdensome appeals.

113. Plaintiffs seek declarations that: (a) contracted rates and pricing labels do not authorize reimbursement below the statutory floor; (b) dispensing fees and other compensation may not be reduced to conceal or offset a below-floor ingredient payment; (c) Express Scripts' challenged reimbursement practices violate Arkansas law; and (d) a later payment adjustment does not extinguish a completed violation or the remedies that flow from it.

114. Plaintiffs seek temporary, preliminary, and permanent injunctive relief requiring Express Scripts to: (a) cease reimbursing Arkansas pharmacy claims below the statutory floor; (b) preserve dispensing fees and other compensation owed above the floor rather than offsetting them against it; and (c) maintain the reasonable appeal process Arkansas law requires, including bulk appeals and invoice-based support. Plaintiffs have no adequate remedy at law for Express Scripts' continuing violations, because repeated unlawful payments impose cash flow, operational, and patient-access harms that a later payment of the ingredient shortfall cannot fully repair.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant and award:

A. A declaration that Defendant's challenged reimbursement, fee, adjustment, and appeal practices violate Arkansas law;

B. Compensatory damages and actual financial losses in an amount to be determined at trial;

C. Statutory damages of up to $10,000 for each violation, in an amount to be determined at trial;

D. Payment, restitution, reprocessing, and disgorgement of all unlawfully retained amounts to the extent authorized;

E. Prejudgment and post-judgment interest;

F. Temporary, preliminary, and permanent injunctive relief requiring lawful reimbursement, preservation of compensation above the statutory floor, and a reasonable appeal process;

G. Attorneys' fees and all costs incurred in pursuing this action; and

H. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: October 28, 2026

Respectfully submitted,

*/s/ Jason D. Sapp*

Jason D. Sapp, #58511(MO)
**SAPP LAW LLC**
75 West Lockwood Avenue, Suite 222
Webster Groves, Missouri 63119
Tel: 313-782-3500
Jason@sapplawllc.com

Scott Poynter*
Clay Ellis*
Will Sumner*
**POYNTER LAW GROUP**
4924 Kavanaugh Boulevard
Little Rock, Arkansas 72207
Tel: 501-812-3943
Scott@poynterlawgroup.com
Will@poynterlawgroup.com
Clay@poynterlawgroup.com

Adam J. Levitt*
Adam Prom*
Eaghan S. Davis*
**DICELLO LEVITT LLP**
10 North Dearborn Avenue, 6th Floor
Chicago, Illinois 60602
Tel: 312-214-7900
ALevitt@dicellolevitt.com
AProm@dicellolevitt.com
EDavis@dicellolevitt.com

Greg Gutzler, #48993(MO)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel: 646-933-1000
GGutzler@dicellolevitt.com

***Counsel for Plaintiffs***

**Pro Hac Vice Forthcoming*